Cisco Systems. Mr. Lee. Thank you, Your Honor. May it please the Court, my name is Bill Lee and together with my partner, Mark Fleming, I represent Apple. I'd like to focus my argument on three issues today, but, of course, I'm prepared to address anything the panel would like. First, I'd like to focus on the claim construction issues of the terms domain name and secure communication link for the 504 and 211 patents. Second, I would like to focus on the requirement of the asserted claims of the second patents, the 135 and 151, that there be a determination of whether a secure website is sought. And third, I would like to address the jury instruction, the alternative jury instruction on the entire market value rule that permitted the jury to use the law. Please start there. I can start there, Your Honor. And really, there are two parts to the issue. There is the jury instruction itself. There is also Mr. Weinstein's opinion. Let me start with the jury instruction itself. There are two parts to the court's jury instruction. Is the small assailable unit a separate requirement, or is it a way of applying the entire market value exception? I don't like to call it a rule. What is this small assailable unit, whoever came up with it? I could go back to that, but I'll use my argument time this way, Your Honor. All right. The principle is what Your Honor articulated. It is an exception. The entire market value rule is an exception. And the question then becomes, how do you apply the exception? And the small assailable unit has been used as a way to apply the exception. But I think the most important part is to start with first principles. And first principles are that the reason the entire market value rule is an exception is that the first goal is to try to figure out what is the value of the patented feature, the patented method, the patented invention to the product. And the entire market value rule says if you're going to use the entire value, you ought to be able to show that it drives consumer demand for the product. The small assailable unit has crept into the lexicon as we have tried to apply that basic principle. And it is a starting point, but I think, Your Honor, going back to the Cornell decision, the Cornell decision which first used it is as a starting point. The mere fact that the small assailable unit is the small assailable unit does not mean that it doesn't have multiple features, does not mean it does not have multiple components, and it does not mean that you can stop the apportionment process. One way to think about it, Your Honor, is this. The entire market value rule and this basic principle says we need to determine the value of the patent which is the overall product. The small assailable unit is a way to start the process, but it's not a way to end the process. It is not the end point in the analysis. It's not a freestanding doctrine that supplants other indicia of demand. That's exactly right, Your Honor. There's both a legal aspect to it and an economic aspect to it. As a matter of economics, it doesn't define demand. It doesn't tell you what demand is for that small assailable product. As a legal matter, Uniloc and Lucent would have come out differently if the stopping point was the small assailable unit. The problem with the jury instruction that the district court gave is it allowed the jury to decide that the small assailable unit was the stopping point, that you needed to go no further. In fact, when the court considers the jury instruction, there are two portions to it. There is first what I would call the traditional exception. You can use the entire market value rule if you demonstrate that the patented feature is the driver of consumer demand. But as the district court said, it thought there was an alternative that allowed you to stop at the small assailable unit. Now, do you think the jury could get it that it's really still just applying kind of the first part of that end or proposition when it looks at this small assailable unit? Your Honor, I think both. Where is the jury misled here, if at all? Your Honor, I think there is an analytical aspect, and there is the application in this context. So analytically, if you have a jury instruction that allows the jury to decide something two different ways, and one is an error, it is a legal error that requires a new trial. That's what I would call the analytical response. The practical response here, though, Your Honor, is that with this jury instruction, Mr. Weinstein used the $70 billion as the revenue base. And he actually, that number came in, that's his revenue base. The frenetics counsel closed specifically on the jury instruction to the small assailable unit. So you have the royalty base that should not come in.  You have a closing that's closing specifically to the second part of the jury instruction. So even if it wasn't legal error requiring a new trial just as a strict appellate matter, it would be error in this case for sure because of the manner in which it was litigated. And I think what we've urged the Court on this issue is that the basic principle of the entire market value rule is correct. It's an exception if you can demonstrate that this is the driver for demand for the product. But in multi-component products which have been before this Court on a number of occasions, products such as these which have cameras, microprocessors, operating software. And then even if I step down a level, even for VPN on demand and FaceTime, there are aspects of those features that are not covered by the patents. In that context, we would suggest that Garrison, Unilock, Lucent all precluded the second part of the instruction. Unilock and Lucent would have come out differently if the principle were, as it does the Court, articulated. And nothing we would suggest in Versada which actually was a different revenue base. It was the defendant's product or the defendant's proposed products that were the revenue base would require a different alternative. So if I could move back to the merits very quickly before I use my rebuttal time. Let me go to the questions of domain name. You'll have the time you need today. Thank you, Your Honor. Let me go to domain name and secure communication link, both of which are claim construction issues, both of which we suggest were claim construction errors. Is this the 135 patent? Yes. No, 504 and 211 patents, Your Honor. I'm sorry? 504 and 211 patents. I sometimes call them also the FaceTime patents because of what the abuse products are. So if I start with domain name, the district court interpreted domain name to mean a name corresponding to an IP address. We suggest that that was error for these reasons. That construction reads the word domain out of the claim. It just makes it a name. It doesn't add anything to say it's corresponding to an IP address because the claims themselves say it corresponds to a network address. So it effectively takes domain name and it makes it into a name. We suggest and believe that domain name has a plain and ordinary meaning. It is a hierarchical sequence of words in decreasing order of specificity. That is actually the way this court used the term in the Akamai panel decision. But perhaps more importantly, Vernetics concedes that that is, to use their words, typical meaning of the claim. We draw the court's attention to A7138 during the Markman briefing process where they say domain name. The typical name is the definition we've provided. In addition, when the district court was considering this, Vernetics actually gave the district court a definition, a definition from a dictionary that was precisely this definition. And then every single example, every single example in the specification is in a hierarchical syntax. Yahoo.com, Target.com, Website.com. These are important because FaceTime, the accused product, doesn't use domain names. It uses telephone numbers. It uses email addresses. So what does Vernetics say? Well, it says that there are references to non-standard domain names. There are. All that is is .scom, indicating that it's a secure website. Nothing that is non-hierarchical. They had an expert testify that this claim term can encompass emails and phone numbers, right? They had an expert testify to it, Your Honor, but I don't think that changes the plain meaning. Let me say two things about what the expert said. The first is that there are references to emails and telephony in the specification. They are referred to as MAC addresses. So the inventors knew how to use the terms email and telephony when they wanted to. They described them as MAC addresses, not as domain names. The second thing is this. The heart of that expert's opinion was this. The heart of the expert's opinion was our claim is not limited to the Internet. Therefore, domain name has an atypical meaning. We don't disagree. The claims on the first proposition, the claims are not limited to the Internet. But we do disagree that in any network, in any network covered by the claims, the domain name does not have a hierarchical structure. It has to. So if you go to the heart of what his real opinion was, which is we can have other networks, the answer is that's true. But even within those networks, it still has to be a domain name. Let me ask you a logistical question. If we were to agree with you on claim construction on either the domain name or the one you haven't gotten yet, but it's obviously in your brief, on the secure communication link, that just involves a new trial, right? I mean, I know you say in your brief, well, there's no infringement under our construction, but the other side tells us not so fast. I understand we have a disagreement on that. The answer, Your Honor, is you are correct. Now, one important aspect of that is that the damage award was undifferentiated. It wasn't by patent. It wasn't by product. It wasn't by theory. So that if the court reversed and had a new trial on any issue, it's all going to have to be retried because even if setting aside the first part of the argument on the entire market value rule construction, there would have to be a new trial because of the undifferentiated single damage claim. Now, on secure communication link, and I can address both of the remaining issues that I wanted to address quickly because I think they're governed by relatively simple propositions. On secure communication link, here's the real dispute. The district court interpreted to require data security but rejected our proposal that it also require identity security or anonymity, anonymity being the sender or the receiver being anonymous. It's important because for FaceTime, there is an outer layer or an inner layer protecting the content of the transmission, but the identity is not anonymous. The identity of the sender is not anonymous, and that becomes important. And the only issue is whether identity security should have been included. And what we can say and have said in our brief is the background of the invention says it's required. The summary invention says it's required. The detailed description of the invention says it's required,  In fact, these patents equate a secure communication link for the virtual private network. Both are secure according to the specifications as to identity and security. And that again becomes important, and I understand we have a dispute between us because of the manner in which FaceTime operates. I'm in my rebuttal time, but if I could address determining whether very quickly, and without going, Your Honor, to the 135 and 151 patents. Again, for all of the briefing and all of the disagreement between us, I think that there are three propositions, one of which is legal, and two of which are undisputed factual matters which resolve this issue. And on this one, we actually suggest it is resolvable as a legal matter. And these are the three propositions. The claims require a determination of whether a target site is secure or not. It requires that there be a determination and a specific type of determination, whether the target website is secure. So that is just on the face of the language, and we both at trial said it was plain meaning. We both said it was plain meaning. Here are the two undisputed factual propositions that should resolve this issue. The first is that if I use my iPad and I go to my VPN connection, it goes to whatever I have. It will only set up a VPN connection if that website is in my configuration file. If it is secure, it will. But if it's eBay.com or WebMD.com or Amazon.com, it will as well, because I put them in there. Equally importantly, but probably more dispensative, is this. If I'm setting up a VPN connection to a secure website and it's not in my configuration file, no VPN will be established. So those three facts, the fact the claims require determination of whether a website, the website for which a connection is thought is secure, and the fact that the manner in which the Apple products operates is to go to a site only if it's in the configuration file, whether it's secure or not, and the fact that if it's not in our configuration file, if it's a secure website and not in our configuration file, there will be no VPN connection. Thank you. Thank you, Mr. Lee. We'll give Mr. Lee an additional five minutes to rebuttal and give Mr. Jakes an extra five minutes if he needs to use that. Good morning. May it please the Court. I'll start with the damages issue. Thank you. Let's look at Mr. Weinstein's admission that in the MAC, the invention is only worth 29 cents. And yet, he also finds that it's worth $6.49 when it's put in an iPhone. Now, why does the same invention get more than $6 of enhancement just because it's put in a mobile device? There was evidence in the record, Your Honor, that the security features were important to the phones in particular, much more so than the MAC computers. The MAC computers, the upgraded software is worth $6. That's worth $6 more. How do I know? Now, this invention is for security features. That's right. Not for the entire video conference app, right? Where is the differentiation there in any of your work before the jury? I would disagree with that because this security feature, it is a way to have secure communication. Now, a specific application of that is video conferencing. So, I actually think video conferencing is a narrower application of the invention. It's not something that's broader that then uses security. I think you're looking at it to be flipped around. Without the security, you don't have… You seem to be claiming the entire value of the video conference under the entire market value rule. How can you do that? You're limited to the claimed invention, which is security, not all video conferencing, which you didn't invent. That's true, but video conferencing is a specific application of this method of creating a secure communication. I think that's actually a broader concept. Video conferencing as well as email and the other applications that are described are narrower concepts within that broad… Your argument is that because you put it in a mobile device, that security is worth $6 rather than $0.29. That's the way the data shook out and that's the way our expert testified and there's evidence to support that. Well, that's looking at the royalty base. Let's look at the royalty rate for a second. Microsoft, you gave a license to Microsoft. That's true. It's somewhere around 0.24%. I think the experts disagreed on what… The Bureau saw it as perhaps half that, 12%, 0.12%, and yet you argue for 2%. That's more than 10 times, 20 times what the record shows was actually used as the royalty rate, the rental value. Our expert actually testified as to 1% as that rate. Which would still be 10 times the amount. Not 10 times, but there was a difference with the Microsoft agreement and that was fully explained to the jury. It was entered into at a time where Vernetix was in some financial distress. It was also the first license they entered into. It was the one license… It was the one instance we have of an actual rental of this technology. There are other license agreements as well, though, Your Honor. It's not the only one. So to simply focus on that one and say that rate had to be used across the board, I don't think is really accurate in what the experts testified to. Now tell me about the jury instruction, which seems to say the smallest saleable unit is a freestanding divorce doctrine from the entire market value rule, which is aggrandized as a rule instead of the exception, which we've made it very clear it is, only when you can show the demand driver. How did you show that? So you have to do two things here for my question. Show me how this is the demand driver for the entire video conferencing app and how this smallest saleable unit gets divorced from the entire market value rule. Well, let's start with what our expert did on his first theory. He did not rely on the entire market value. That number was not given to the jury. There was no taint. The entire revenue was never given to the jury. So we start there. What our expert did was try to determine what the smallest saleable unit was by looking at the lowest price the product had ever sold for, getting rid of all the features like extra memory that he could to get it down to that smallest unit. What is he looking at for that? What's the unit that he's selling there? The smallest saleable unit. Of what? Of whatever the product is. What is the product? In some cases, it was a software upgrade to the Mac, which was a $29 unit. In other cases, it was an iPod Touch. In other cases, it was an iPhone. But stripped of the other features and at the lowest price at which it had been sold. Now the Versada case, as the court recognizes, says that the entire market value as a way to calculate damages is the exception. It's the exception to the general rule that the royalty is based on the smallest saleable patent practicing unit. That's exactly what was done here. Now there are other theories. Did you show that demand for the entire product was driven by your small claimed feature? For some products, yes. Show me that evidence. Just give me a quick sight to it and I'll check it later. Well, let me explain. This is the expert's third damages theory for FaceTime. There was evidence that, in the form of a survey, that certain people purchased iPod Touch, the iPod Touch, because they wanted FaceTime. And that was a certain number of customers that said, I purchased it for a specific feature and that specific feature... That was over 50%? No, it wasn't. No, it was under 10, wasn't it? No, it wasn't under 10. It was 18%. Oh, 18. But of course, to be a demand driver, it would be at least over 50, wouldn't it? Right. So our expert did not use the entire market value rule. I think we're confusing a couple of different theories here, right? Right. I mean, there was one proposed theory where the expert used the smallest saleable unit... That's right. ...which arguably somehow morphs into something that looks very much like the entire market value exception. And then there's another theory where the expert for the FaceTime patents tried to do some kind of apportionment... That's right. ...but then ultimately used something called the Nash bargaining solution to finish off his theory. Right. And that's an arguable additional defect, at least for that particular theory. And there was a third theory as well. And that was based on the iPod Touch survey where the expert used that to come up with a per unit royalty that was based on the demand for that particular product and using those calculations... But that was also... Well, infected is a loaded word. That survey evidence and that percentage was also part and parcel of what the expert said. He then applied the 45% so-called Nash numbers... He did. ...in his analysis of that data, right? Right. Instead of allocating all the incremental profit to the patent owner, he split it. And he did it in a way that was consistent with the Nash bargaining. Nash bargaining? Yes. Is it ever anything other than 50-50? It was in this case. You discounted it generously... Right. ...by 10%. Right. Isn't that a rule of thumb? Didn't we just smack that down in Unilock when you start using 50-50 rules of thumb, even if you start discounting them, which was often done with the Goldscheider rule? Well, there are two differences with Unilock, Your Honor. One is that in Unilock, that rule of thumb was applied to the profit on the product, not the incremental profit. And here, what the expert did is he tried to separate in a portion that incremental profit, not the profit on the entire product. What's your second distinction? The second distinction is it has an academic background. It comes from a well-researched, well-published theory that people have accepted as the general theory of economics, that when you have the incremental profit due to whatever it is... You're going to split it 50-50. ...all things being equal. But there are things you can consider, other factors. All the math landed at this elegant solution of 50-50 perfectly? Well, that's the starting point, yes. That two people behaving rationally, if they were to say, look, we can enter into this agreement or not. If we enter into it, you will get this additional incremental profit. You start with a 50-50 split and adjust that based on various factors. Were there alternatives? Let's say the infringer could have made half that incremental profit using a non-infringing alternative. Well, then you don't split that part. This really is a well-developed theory that is accepted. And I don't really think the criticism here is with the methodology. It's with the expert's conclusions. He came to a conclusion that was given to the jury, and the jury actually cut it back substantially. So there is substantial evidence to support the verdict. There are also these three theories. Now, if one of them happens to fall out under cases like I-IV-I or the energy transportation case, I believe in that case, the expert used the 25% rule, but there was an alternative theory to support it, and that was substantial evidence to support the verdict. And each of these theories came out to a very similar amount, which then the jury awarded a percentage of. So even if there may be some defect in any of them, another theory can support it. Just one more time. As I understood it, every theory either relied on a smaller sales unit or, at some point, national bargaining solutions. That's true. Is there another one? No, there isn't another. I thought there were the licenses. Yes, Your Honor. The license agreements were used as part of the, what I would say the expert's first theory, where he came up with a reasonable royalty rate of 1% that was based on not the entire value of the product. He did not use that. It was substantially less than that number because he did a portion. He did look at the lowest price at which it had ever sold. He got rid of all the features that he could. The so-called small sale. That's right. The cheapest iPad that I could find. That's right, without all the memory, with all the features that could be stripped away. I don't think the case law, whether it's Lucent or any of the other cases, says you have to go below that. You have to somehow come up with a hypothetical smaller unit that has never been sold. In fact, if you look at cases like Laser Dynamics, that was the one that had the laptop and the disk drive. That disk drive performed other features beyond what was claimed in the patent, but it was sold separately, and so that could be used as a basis for the royalty as opposed to the overall computer. I don't think we've gotten to the point where you have to come up with a hypothetical unit that was never sold. Now, if I could talk about domain name. This was a claim construction issue, and based on the specification, the district court judge here said that a domain name is a name corresponding to an IP address. There's nothing in the word domain that means hierarchical. That word does not mean hierarchical. It's a network term, but it does not mean that. So simply saying domain name transfers name into something that's hierarchical is not correct. If you look at the claim language, it suggests what the correct meaning of the domain name is. It corresponds to an IP address because that's the function it performs in this invention. And the patents teach here that there are secure connections to private networks, private computers. It's not about connections to the World Wide Web. So we kind of have to get rid of our own notions of what a domain name is. You can't just think, well, I know it's Yahoo.com because I'm familiar with that. Domain names mean something else in the context of this invention and to a person of skill in the art. They are not limited in the way that Apple is arguing. I'm sorry. What about the secure communication link and whether it covers anonymity? Because it seems to me, I mean, one of your arguments is waiver. Let's assume hypothetically that we reject the waiver argument. Yes. There's a lot in the specs that Apple points to that points to this direction of anonymity, and I really just saw virtually nothing or very little from you that points us the other direction. Well, let's start with the basic premise that secure communication link and virtual private network, they're two different terms. So they ought to mean something different unless they are used synonymously. They're not used synonymously. If we think they're used interchangeably, then there's a problem. Then it means the same thing. Interchangeably in one sense, and that is that a virtual private network is a type of secure communication link, not necessarily vice versa. So when you say interchangeable, you have to look at the way that that's being used. Yes, you could say the secure communication link in this particular embodiment is a virtual private network. When I first looked at the term secure communication link just by itself in the abstract, it could be pretty broad, right? It could. Secure can mean a lot of different things. In different ways, yes. But you're not suggesting that your secure communication link as it's used in your patent claim covers something like a firewall, does it? No, it doesn't cover that specifically. Right. So firewalls and perhaps other forms of physical security are outside the scope of secure communication link. The court's construction is that it had to provide data security through encryption. So I guess my point is we can't just go with some abstract ordinary meaning. We have to do a little more work here to try to figure out what does it mean, and we have to start looking around the specification. That's right. Given that it doesn't cover things like firewalls. It's not specifically directed to firewalls. I don't think those are excluded, and that's why Apple proposed modifying the construction, and its proposed construction was a communication link that provides data security through encryption, and that's what the court gave. Now that's why we say there's a waiver. That was their proposal. But what about, what is the two-layer encryption format? What are the two layers that are being described in the first sentence of your summary of the invention? The two layers, one as to the content and one as to the address. Identity. Yes. Anonymity. Yes, that's right. And then the background of your invention is talking about how the two big security issues are data security and anonymity. That's true. And that's why your summary of the invention talks about this great new protocol that provides the two-layer encryption format for data security and anonymity. And those are two aspects of security. Now, the question is, are they both required? And I point you to, in the 504 patent, at column 39, line 24, it talks about a secure communication path and says that with a secure communication path, the IP address could be revealed over the internet and the path is thus not anonymous. Yeah, I guess the problem with that passage, and I'd like to hear you respond to this, is the Gray brief pointed out that that was really just a conventional type of secure communication path. And then two paragraphs down, it talks about this invention, your invention, creates a virtual private network. And so therefore, it doesn't suffer from this identity concern. Right. And there we're back to the issue before that a virtual private network is a type of secure communication path that has both encryption and anonymity, but not necessarily that has to be true for a secure communication link. I guess the concern I have is, whenever I try to find the buzzword secure communication link in this spec, I see it getting, it's connected to virtual private network and that's, I'm talking about columns 49 and 50 and 52. You know, there's secure communication link, that's any time a communication link is established, the link is a VPN link. And so I'm trying to figure out whether the disclosure here has tethered the claim term secure communication link to a VPN. Well, if it has, it's loosely tethered because a VPN is a type of secure communication link, not that a VPN is necessarily the only thing that a secure communication link can be. And that goes back to sort of where I started where these terms are different for a reason. One is broader than the other. And if you look at the embodiment of a virtual private network, of course that has both types of security, but for just the broader term secure communication link, the judge was right when he started, it has a direct communication link that provides data security. Okay, so I guess when it comes to divining something from this spec to get the best understanding of secure communication link, the best thing you have to point me to is column 39. I think that's our best point in the spec, but I think it also goes to the words. Secure communication link doesn't mean secure in every possible aspect. And that's really what is being asked for. And it doesn't include firewalls either. The construction was through encryption that Apple wanted to add, and we agreed to that. The original construction was just a direct communication link that provides data security, which could have covered other things as well. Apple proposed that through encryption be added, and we agreed to that. Before you sit down, I just want to hear one more time. Weinstein starts with the price of the iPhone. How does he claim any right to start there in his equation when the claimed invention is only a security application for two of the hundreds of applications that it can appear on that iPhone? It's the smallest available unit. It's the way Apple sells it. And to require him then to go in and say, I have to segregate out whatever has to be attributed to this particular invention is not something that is required. In this particular case, he did not... If he can show that consumers all buy an iPhone just so they can have security on their VPN and FaceTime, which is the reason they have the phone in the first place, but I think they have the phone for some other reasons, don't they? You're right, Your Honor. And that's why for his third theory on using the iPod Touch to come to a reasonable royalty, he only focused on those in the consumer survey where they said, this is the reason I bought it. But just because it's a larger product doesn't mean that it can't be used as the royalty base. He did the apportionment. He did cut it back to what was the smallest available unit and getting rid of all the other features. So the entire market value rule is the exception to this general principle that you can look at the smallest available unit. Okay. Mr. Lee, you have at least five minutes. Thank you, Your Honor. Let me start where Mr. Jacobs ended. He did use the entire market value rule for his first theory. And the second and third theories were dependent upon the first theory because the first theory covers the products before you had both VPN and FaceTime. He used the entire market value. And something's been happening in district courts where experts say I'm not invoking the entire market value rule. But it doesn't matter what they say. It matters what they do. And here what they did is they took the base model without the incremental memory. It's like taking a car and excluding the extended warranty and saying I'm using the smallest available unit. He used the base models. He ignored the price of the Mac software upgrade, which was $29. So he had something he could have used. He used the base model entirely. That's violated the entire market value rule because at Appendix Site 1662-63, he was asked explicitly, are you here to give an opinion that these features, dependent features are the driver for consumer demand? And he says I'm not. They contribute, and that's all I can say. So what happened is they started with, they used the base, which is much more than just video conferencing. It's the entire base product with the phone, the camera, email, everything. They didn't even use just FaceTime VPN, which might have been the software upgrade. And they should have used something actually smaller than that because these only contribute a portion to FaceTime VPN. And again, A1143 is where they can see that fact. The third theory doesn't save them for these reasons. First, as we point out at page 59, footnote 1300 brief, the math is actually wrong. He gets down to 18%. If you do the math, the math should get him down to 10%. It's just a numerical error in his computation. But more importantly, the theory depends both on the Nash bargaining solution, which we say is just an arbitrary 50-50 split, not tied to the realities of this hypothetical negotiation at all. And it's also dependent upon the first theory, additively, because that's how he gets the pre, the FaceTime before there's VPN on demand. So they're all together. Unilock actually tells us even if you had the three and they weren't interrelated and one was a check, that's enough for a new trial when you're in this circumstance. Let me just briefly address the question of secure communication link. There was no waiver. What happened is, and I think the record demonstrates this, at the outset, we said a secure communication link and a virtual private network were the same. And the district court interpreted virtual private network to require both data security and identity security or anonymity. He adopted a different claim interpretation for the secure communication link requiring only data security. After that, there were events in the reexamination and we came back and said, well, even if that's your definition, it needs something additional. It needs to say encryption. That's what happened. There was no waiver. And to go to Judge Chen's question, this is what the 504 patent states. At column six, line 6163, the secure communication link is a virtual private network communication link over the computer network. It's an equation. And if you then take the equation and match that against the background of the invention, the summary of the invention, the disclosed embodiments, and the description, all of them have both data security and identity security. FaceTime does not have that. Thank you. Thank you very much. I'd like to once again thank Mr. Jakes, your associates, Mr. Lee, your associates, for being here today and helping the court immensely. Thank you very much.